**TRANSAMERICAN TRAILER TRANS- PORT, INC., Petitioner,**

**v.**

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

**No. 553, Docket 73-1979.**

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1974.

Decided March 14, 1974.

George F. Galland, New York City (Galland, Kharasch, Calkins & Brown,

---

Amy Scupi, and Olga Boikess, Washington, D. C., of counsel), for petitioner.

John B. Wyss, Dept. of Justice, Washington, D. C. (James L. Pimper, Gen. Counsel, Edward G. Gruis, Deputy Gen. Counsel, and Gordon M. Shaw, F. M. C., Washington, D. C., Thomas E. Kauper, Asst. Atty. Gen., and Irwin A. Seibel, Dept. of Justice, Washington, D. C., of counsel), for respondents.

Before LUMBARD, FRIENDLY and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

Although the parties have treated this petition to review as presenting portentous questions of the power of a regulatory agency over tariff filings, in fact it is a Donnybrook of microscopic triviality. The controversy stems from an order of investigation and suspension (hereafter the suspension order), *see generally* 46 U.S.C. § 845, issued by the Federal Maritime Commission (FMC) on March 16, 1973. The order related to tariffs of petitioner Transamerican Trailer Transport, Inc. (TTT) (as well as two competitors of TTT not involved in the present litigation), which, so far as here relevant, proposed a 15.2% surcharge on traffic between United States Atlantic ports and Puerto Rico, allegedly to offset increased labor costs resulting from the carriers' contract with the International Longshoremen's Association. Other issues relating to the labor agreement are before this court in New York Shipping Association, Inc. v. Federal Maritime Commission, Docket No. 73–1919, heard by this same panel, and Transamerican Trailer Transport, Inc. v. Federal Maritime Commission, Docket No. 73–2253, which we direct shall also be. After examining data submitted by the carriers and various protests, the FMC concluded, on the one hand, that the proposed surcharge should be made the subject of a public investigation and hearing but, on the other, that "the full exercise of its suspension authority would not be warranted" and that "that portion of the surcharge not exceeding 5.2% applicable to all U.S. Atlantic ports would not require suspension, although the entire surcharge will be subject to investigation herein." In the decretal portion of the order, the FMC directed that an investigation should be instituted into the tariff pages providing for the 15.2% surcharge; that these pages should be suspended through July 16, 1973 unless otherwise subsequently ordered; that the carriers should immediately file supplements describing the suspended matter and stating that the tariffs could not be used until July 17, 1973, unless otherwise authorized by the Commission; and that the carriers might file "the tariff matter necessary to effectuate a surcharge of 5.2% on all rates between U.S. Atlantic ports and ports in Puerto Rico, such tariff matter to become effective on not less than one day's notice and to expire on July 16, 1973, unless otherwise ordered by the Commission."[1]

TTT's two competitors filed new tariff matter which recited that the pages proposing the 15.2% surcharge had been suspended pending investigation and placed the temporary 5.2% surcharge in effect. TTT's Supplement No. 35, filed on March 16, 1973, effective March 18, 1973, to which a copy of the suspension order was appended, recited that only 10% of the surcharge was suspended and that a 5.2% surcharge would be applied during the period of suspension. Although the legal effect of TTT's filing did not differ from its competitors', the FMC staff objected by telephone that Supplement No. 35 misstated the suspension order since in fact the whole of the 15.2% surcharge had been suspended with leave to file a temporary 5.2% surcharge. When counsel for TTT refused to reword the supplement, at least until the FMC had put its objections and pre-

---

1. We are informed by the Commission that, at least as of February 26, 1974, it has not completed its investigation into the 15.2% surcharge. By its own terms and as required by statute, the suspension order lapsed on July 16, 1973.

ferred language in writing, the FMC staff, on March 23, 1973, rejected Supplement No. 35.

After many recriminatory writings back and forth, TTT on May 4, 1973, filed Supplement No. 36. This bowed to the staff's view that the entire 15.2% had been suspended and proposed a 5.-2% surcharge during the period of suspension but effective March 18, 1973. This was immediately rejected on the ground that it did not provide for effectiveness on one day's notice as the Commission's order had specified but purported to have retroactive effect. A request by TTT for reconsideration on May 14 brought a similar rejection two days later. Finally, faced with the possibility of actions by shippers to recover the 5.2% surcharge paid while no tariff providing for this was on file, TTT on May 17, 1973 filed Supplement No. 37, which was accepted; this recited suspension of the entire 15.2% surcharge and made the 5.2% surcharge effective May 18, 1973, "without prejudice to the Carrier's position that valid Suspension Supplements imposing the surcharge beginning March 18, 1973 were lawfully filed but rejected by the Federal Maritime Commission." After the FMC had rejected requests that Supplement No. 35 be deemed to have been effective until the effective date of Supplement No. 37 and that Supplement No. 37 be deemed to have been issued in lieu of Supplement No. 36, TTT filed this petition to review that rejection.

■ TTT's plight is largely of its counsel's own making. Our notions of arithmetic are not sufficiently refined to detect any difference in result between 15.2%—15.2% +5.2% and 15.2%—10.-0%. Neither would acceding to the views of the FMC staff and amending Supplement No. 35 before its rejection, as the staff had suggested, have affected TTT's legal position in any way. Furthermore, the staff's position accorded with the decretal portion of the suspension order although language in the body of the order looked the other way. However, the FMC staff also deserves high marks for obstinacy. Although an elaborate brief, citing 45 cases, asserts the importance of form in tariff filings, it fails to explain what hurt would have been inflicted, save on the feelings of the staff, if Supplement No. 35, which included the full text of the suspension order, had been allowed to take effect. Form is one thing and formalism is another. At the very least, once TTT had made the trip to Canossa, it was an abuse of discretion for the Commission not to use its power under § 25 of the Shipping Act, 46 U.S.C. § 824, to allow Supplement No. 35 to become effective for the interval between March 18 and May 18, 1973.

■ While we dislike awarding a victory medal to TTT's counsel, whose stiff-necked attitude has produced wholly unnecessary work for the FMC and for us, we cannot disregard the serious consequences which denial of the petition might have. Although the FMC points out that equitable arguments may be considered in defense of a shipper's claim under § 2 of the Intercoastal Shipping Act, 46 U.S.C. § 844, and § 22 of the Shipping Act, 46 U.S.C. § 821, for charges collected in excess of those provided in a filed tariff, see Consolo v. FMC, 383 U.S. 607, 621–622, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), any joy TTT might otherwise gain from this is considerably tempered by the FMC's listing no fewer than seven "equitable" considerations which allegedly would influence it to rule adversely; and the *Consolo* decision emphasizes how limited is the power of a reviewing court in a reparations proceeding to interfere with the Commission's exercise of discretion in weighing equitable factors. Recovery of overcharges not only would inflict on TTT an injury disproportionate to the offense, if offense there was, but would confer an undeserved and discriminatory benefit on shippers who utilized the services of TTT rather than of its two competitors. The FMC's action thus not only serves no valid regulatory purpose but might achieve the opposite. Considering how trifling was the defect in

Supplement No. 35 and that even this drew some support from the text of the suspension order, we direct the Commission to permit it to be filed effective for the period March 18 until May 18, 1973.

It is so ordered. No costs.